664 So.2d 1264 (1995)
STATE of Louisiana
v.
Floyd ALLEN.
No. 94 KA 1941.
Court of Appeal of Louisiana, First Circuit.
November 9, 1995.
*1267 Wiley J. Beevers, Gretna, for Defendant-Appellant.
Doug Moreau, District Attorney, Gwendolyn K. Brown, Asst. District Atty., Baton Rouge, for State.
Before FOIL, CRAIN, JJ. and TANNER, J. Pro Tem.[1]
THOMAS W. TANNER, Judge Pro Tem.
Floyd Allen was charged by bill of indictment with the second degree murder of John Anthony Edwards, a violation of La.R.S. 14:30.1. Represented by counsel, Allen entered a plea of "not guilty" at the arraignment conducted September 11, 1992. Following the disposition of pretrial motions, the matter proceeded to a jury trial on July 19, 1993, with Judge Curtis Calloway presiding.
Following deliberation, the jury returned a guilty verdict on July 22, 1993. Judge Calloway sentenced Allen on October 22, 1993, to life imprisonment at hard labor without benefit of probation, parole or suspension according to the penal provision of La.R.S. 14.30.1. From the conviction and sentence the defendant now appeals, urging four assignments of error:
1. Appellant was denied a trial by a fair and impartial jury and due process of law as a result of the prosecutor's gross misstatements of the law.
2. Defense counsel's performance was deficient, showing ineffective assistance of counsel, resulting in errors so serious that counsel was not functioning as "counsel" guaranteed to defendant under the Sixth Amendment; La. Const. Art. 1, sec. 13; USA Const. Amend. 6.
3. The evidence introduced at trial was insufficient for any rational trial jury to reasonably conclude that the prosecution had proved beyond a reasonable doubt that the requisite presence of the essential element of specific criminal intent was not mitigated by the state of mind of the defendant at the time of the offense charged.
4. Any and all errors patent on the face of the record.

FACTS
On the evening of June 6, 1992, Larry Jordan, his mother (Juanita Triplett), and a friend of hers (Larry Johnson), met at Jordan's home after work. The three sat around for a while, talked, and had one or two beers. Around 11:00 p.m., the trio decided to go out to a nearby lounge called Stan's. When they arrived about 11:30, both the parking lot and the lounge were full. Jordan met a number of people he knew and remained near his car with his friends. As the crowd flowed by, he recognized several people and exchanged greetings as did others in the group. A police officer, whom Jordan knew as a result of a previous brush with the law, was on routine patrol and, as he cruised through the parking lot, he also spoke with Jordan, advising him to stay out of trouble.
The defendant, Floyd Allen, his girlfriend (Demetrice Ruth), his brother (Ricky Allen), and Ricky's girlfriend (Stephanie), after leaving another bar, had also arrived at Stan's about 11:30. Because the lounge was so crowded they couldn't get a table, the defendant and Ms. Ruth were also outside in the parking lot.
*1268 Shortly after the officer left, around 1:00 on the morning of June 7, 1992, a fight broke out between Jordan and the defendant. The fight had no apparent basis. Jordan testified at trial that the defendant had walked by his auto a number of times, talked to persons across the street, and then returned and stared. Jordan indicated that he felt threatened by the defendant's behavior and the fight just started. Jordan admitted that he may have thrown the first punch. The defendant agreed, testifying that Jordan approached and struck him in his face for no reason.
Although, due to the pressure of the crowd, the location of the fight moved from in front of Jordan's car to the other end of the parking lot, the fight was only of short duration and moderate intensity. All the witnesses agreed that no blood was drawn and no one appeared injured by the encounter. It ended abruptly when the defendant, defeated, fled the scene in the direction of his mother's home a short distance away.
A second scuffle almost ensued a few minutes later when Jordan observed a person resembling the defendant in the crowd. The two men had already squared off when a mutual acquaintance of both Jordan and the other subject advised Jordan that the subject was not the defendant.
After both parties backed off from the threatened altercation, Jordan resumed his position on the hood of his car. His attention was diverted, as was that of others in the parking lot, by a woman screaming. As people turned in that direction, at least three shots were fired, although possibly more. Everyone in the area sought cover, most hiding under or alongside their cars.
David Gibson was also in the parking lot of Stan's that evening. He had arrived earlier with some friends, including the victim, John Edwards. He saw the last of the fight between Jordan and Floyd Allen, both of whom he knew, Floyd Allen perhaps better since he was dating Gibson's cousin, Demetrice Ruth. After the fight ended, he went to find his friends because he was ready to leave. He located Edwards and his date, and was walking across the street to tell Jordan he was leaving when he heard the shots. Gibson ducked under a nearby car for protection, as did the others. When he looked up after the shooting, he saw the defendant standing at the edge of the lot holding a gun. As he watched, the defendant fled. Gibson then began looking for his friends. He found Edwards lying nearby with a bullet wound to the head. He cared for his friend until the paramedics arrived and called Edwards' family to tell them what had happened. Gibson later gave a statement to the investigating officers, identifying Floyd Allen as the shooter.
Larry Jordan and Larry Johnson also named Floyd Allen as the shooter. Both had seen and recognized him as they had turned toward the screaming woman immediately before hearing shots fired. Both stated he was holding a gun.
Allen was arrested later that morning at his mother's house. Although at first he denied being at Stan's the previous evening, he later admitted being there and fighting with Jordan. He continued to deny that he returned following the fight with a weapon and shot into the crowd. He maintained that he went to his mother's house after his altercation with Jordan and stayed there until his arrest later that morning. Demetrice Ruth, Floyd Allen's brother, Ricky, and Stephanie Johnson testified that Floyd Allen was home at the approximate time of the shooting.

ASSIGNMENT OF ERROR NUMBER ONE:
By this assignment, the defense contends that the cumulative effect of remarks made during the prosecutor's closing argument deprived the defendant of a fair trial. The defense argues that the prosecutor's use of the term "compromise" when referring to the responsive verdict of manslaughter implied to the jury that they must surrender their principles to reach such a verdict. The defense claims further that the misstatements of law concerning responsive verdicts generally and, more specifically, the responsive *1269 verdict of manslaughter amounted to a due process violation, when viewed against the backdrop of the case.
The complained of remarks occurred during rebuttal argument and are excerpted in their entirety:
... And there was some talk about responsive verdicts. The only way that you can come back with a responsive would be if you don't believe that Floyd Allen had the intent to kill or inflict great bodily harm. And if you don't believe that somebody standing in the middle of the street, firing a weapon in the direction where people are standing, this guy had just gotten in a fight withfifteen minutes beforenot even just got in a fight with. But if you don't believe he intended to inflictto kill him or inflict great bodily harm on him, you can come back with manslaughter. Or if you believe, as it says, that the homicide would be murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection; not deprive Floyd Allen of his self control and cool reflection, but an average person. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time that the offense was committed. Number one, there wasn't sufficient provocation for him to do this. And even if there was, there was plenty of time for his blood to cool. But he went back there with a purpose. Or if you believe there wasn't an intent to cause death or great bodily harm, manslaughter is appropriate if the offender is engaged in the perpetration or attempted perpetration of a felony, which is not murder, or of any intentional misdemeanor directly againstdirectly affecting the person. Now, the judge will instruct you that a misdemeanor directly affecting the person is the crime of aggravated assault. An aggravated assault is an assault committed with a dangerous weapon. Very simple. A gun. So if you don't believe that he went out there with the intent to kill or hurt or inflict great bodily harm, certainly you will believe that he went out there and there was some type of assault; a gun, a dangerous weapon. Or the felony, which in this case is illegal use of a weapon or dangerous instrumentality. Illegal use of weapons or dangerous instrumentality is the intentional or criminally negligent discharge of any firearm, or the throwing, placing, or anyor other use of any article, liquid, or substancein this case we're obviously talking about a firearmwhere it is foreseeable that it may result in death or great bodily harm to a human being. So, yes, if you want to compromise, you don't believe he intended to inflict great bodily harm or to kill somebody, if you believe that there was sufficient provocation, you can compromise and come back with manslaughter. But the facts don't support it....
The prosecutor's remarks on rebuttal followed those of defense counsel who concluded his closing argument with the following appeal to the jury:
... But let's don't make two victims because of this [the fact that the victim cannot be brought back to life] and the weaknesses in the state's case. And as I you'll beyou'll be told by the judge that there are some other verdicts that are responsive to this charge of second degree murder. And there are some people on the jury who will say if you charge a person with second degree murder that I want strongI want strong evidence from the state before I'm going to convict that person. Now, then you get down to some responsive verdicts and while this technically may not be the best fashion, but juries sometimes compromise and they will... the judge will instruct you on those responsive verdictsand then you will come down to theto the bottom line. I never will forget, a long time ago, it seems like, there was this lawyer that II recall that in closing he wouldyou know, he would say, you knowand point out to the jury, that this is a close case and it's a *1270 difficult case, but if you do make a mistakeand he would point this outif you do make a mistake, make it in favor -in -in -in favor of the defendant. Because all it means is anotheranother loss in the loss column for the state. But it means everything in the world to this individual. If you make a mistake against him, you have ruined him forever. He'll never see the sunshine....
It is readily apparent that the thrust of the state's rebuttal was to argue that the compromise verdict sought by the defense was not warranted under the facts of this case. The prosecutor outlined the circumstances under which a manslaughter verdict would be proper, tailoring his argument to the applicable statutory provisions. He pointed out that a responsive verdict must be based upon a belief that this defendant's subjective intentions and overt actions more clearly fell within the parameters of the definition of manslaughter rather than second degree murder, implying that sympathy was not an appropriate basis for a compromise verdict. La. C.Cr.P. art. 774 defines the scope of argument:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Thus, we find the state's argument within the proper scope of rebuttal. Cf. State v. Flank, 537 So.2d 236, 240 (La.App. 4th Cir.1988).
Moreover, even assuming that the prosecutor's remarks constituted a misstatement of the law, or counselled the jurors to disregard the responsive verdicts, the jurors were correctly instructed as to the availability of responsive verdicts by the trial court, and were made aware of the elements of each responsive offense, negating the error, if any, made by the prosecutor during argument. Cf. State v. Cavazos, 610 So.2d 127, 128-129 (La.1992); State v. Jones, 565 So.2d 1023, 1030 (La.App. 1st Cir.1990), writ denied, 585 So.2d 565 (La.1991). The trial judge also advised the jurors that the arguments of counsel were not evidence, stating pertinently:
In closing arguments, the attorneys are permitted to present for your consideration their analysis of what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence. Therefore, the comments, objections, the opening and closing arguments of the lawyers for either side are merely that and nothing else. It does not constitute evidence. It's their analysis, interpretation, conclusion and theory of the case. You may accept it or reject it just as it appears to be reasonable and logical and coinciding with whatever facts you find to have been proven or not proven, just as you may be impressed with it or not.
It is well settled that, before a verdict will be overturned on the basis of improper argument, the reviewing court must be thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Webb, 419 So.2d 436, 441-442 (La.1982) and cases cited therein. In this case, we do not consider that the prosecutor's remarks had an impact on the verdict rendered.
The assigned error, therefore, lacks merit.

EFFECTIVE ASSISTANCE OF COUNSEL
By the second assignment of error, appellate counsel challenges the effectiveness of the defendant's trial counsel. He contends that trial counsel failed to conscientiously raise and argue mitigating circumstances to the jury, relying rather on a misidentification/alibi defense. Appellate counsel argues further that trial counsel erred in failing to object during rebuttal argument to the prosecutor's allegedly erroneous statements of law and in failing to request a curative instruction.
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) *1271 established a two-fold test to evaluate claims of ineffective assistance of counsel. First, the defendant must show that counsel committed errors so serious that he or she was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. Second, the defendant must show that the errors were so serious as to deprive him of a fair trial, one with a reliable result. Strickland v. Washington, 466 U.S. at 686-88, 104 S.Ct. at 2064. The defendant must make both showings in order to prove that counsel was so ineffective as to require reversal of the conviction.
A claim of ineffective assistance of counsel is more properly raised by an application for post-conviction relief where a full evidentiary hearing may be conducted. Only where the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel when raised by assignment of error on appeal, may it be addressed in the interest of judicial economy. State v. Lockhart, 629 So.2d 1195, 1207 (La.App. 1st Cir.1993), writ denied, 94-0050 (La.4/7/94), 635 So.2d 1132. The allegations of ineffectiveness contained in brief relating to the choice made by counsel to pursue one line of defense as opposed to another constitutes an attack upon a strategy decision made by trial counsel. This Court, in State v. Martin, 607 So.2d 775, 788 (La.App. 1st Cir.1992), held that the investigation of strategy decisions requires an evidentiary hearing and, therefore, could not possibly be reviewed on appeal. Cf. State v. Lockhart, 629 So.2d at 1207-1208. Accordingly, the claim of ineffectiveness, as it relates to the choice made by counsel between alternative defenses available, is not subject to appellate review.
Appellant also contends that trial counsel was ineffective in failing to object to the rebuttal argument of the prosecutor and in failing to request curative instructions from the trial judge. As this Court has determined that the remarks of the prosecutor fell within the proper scope of rebuttal and that the closing instructions to the jury were sufficient to overcome any minor misstatement of law made by the prosecutor, had any occurred, defendant has failed to demonstrate that the alleged error by trial counsel prejudiced him or made the trial result unreliable. Since such a showing has not been made, the claim of ineffectiveness with regard to this issue lacks merit.

SUFFICIENCY OF THE EVIDENCE
The defense next contends that the evidence was insufficient to support the verdict of second degree murder. Counsel asserts in brief that the crime actually committed was manslaughter. He argues that the defendant was provoked as a result of his public defeat by Larry Jordan and had insufficient time to "cool off" before the shooting.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the U.S. Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find that the elements of the crime had been proven beyond a reasonable doubt. State v. Holliday, 623 So.2d 127, 129 (La.App. 1st Cir.), writ denied, 629 So.2d 358 (La.1993).
Second degree murder is defined by La.R.S. 14:30.1(A)(1) as "... the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." To sustain the defendant's conviction, it must have been established at trial that the defendant killed John Anthony Edwards and that he acted with the specific intent to kill or to inflict great bodily harm.
Specific intent is defined as that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Specific intent is a legal conclusion to be resolved ultimately by the trier of fact. *1272 State v. Washington, 484 So.2d 946, 950-951 (La.App. 1st Cir.1986). Since specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances present and the actions of the defendant. State v. Price, 498 So.2d 244, 247 (La.App. 1st Cir.1986), writ denied, 503 So.2d 474 (La.1987). When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This standard is not purely separable from the Jackson sufficiency standard so as to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Holliday, 623 So.2d at 129.
We find that a rational trier of fact could have inferred that the defendant possessed the specific intent to kill. The evidence showing that the defendant fired a lethal weapon, aimed in the direction of a crowd of innocent bystanders, is clearly sufficient to prove he had the specific intent to kill or to inflict great bodily harm. Cf. State in Interest of L.H., 94-903 (La.App. 3rd Cir. 2/15/95), 650 So.2d 433, 436; State v. Thomas, 609 So.2d 1078, 1083 (La.App. 2d Cir. 1992), writ denied, 617 So.2d 905 (La.1993); State v. Kennington, 515 So.2d 521, 523 (La. App. 1st Cir.1987). Thus the state presented sufficient evidence to show that the defendant killed the victim and that he had the specific intent to kill or to inflict great bodily harm, the elements of second degree murder.
However, a homicide committed in sudden passion or heat of blood, immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection, is manslaughter. La.R.S. 14:31(A)(1). The presence of "sudden passion" or "heat of blood" are not elements of the offense of manslaughter, but, rather, are factors in the nature of mitigating circumstances which may reduce the grade of homicide. State v. Thorne, 93-859 (La.App. 5th Cir. 2/23/94), 633 So.2d 773, 777; State v. Holliday, 623 So.2d at 130; State v. Maddox, 522 So.2d 579, 582 (La.App. 1st Cir.1988). When the preponderance of the evidence shows that a homicide was committed in "sudden passion" or "heat of blood" which would deprive an average person of his self-control and cool reflection, a jury errs in returning a verdict of second degree murder. State v. Thorne, 633 So.2d at 777. In reviewing a claim that the defense proved the presence of mitigating factors by a preponderance of the evidence, the appellate court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 110-111 (La.1986); State v. Thorne, 633 So.2d at 777; State v. Holliday, 623 So.2d at 130.
The guilty verdict in this case indicates that the jury rejected the possibility of manslaughter, concluding either: (1) that the argument between the defendant and Larry Jordan was not sufficient provocation to deprive an average person of his self-control and cool reflection or (2) that an average person's blood would have cooled by the time the defendant shot the victim. Cf. State v. Maddox, 522 So.2d at 582. The defendant argues in brief that the fight between himself and Larry Jordan constituted sufficient provocation to deprive an average person of his self-control and cool reflection and that insufficient time elapsed between the altercation and the shooting to allow a "cooling off" period. We disagree. The evidence adduced at trial established that the fight in the parking lot was of short duration and relatively minor. All of the witnesses agreed that no one had been injured during the scuffle and that not even clothing was torn. While the defendant and his girlfriend testified that they observed Larry Jordan with a weapon, other witnesses denied that Jordan was *1273 armed with anything other than his fists. However, even assuming arguendo that the fight constituted provocation sufficient to obscure the defendant's judgment and cause him to act out of impulse or passion had he sought to immediately revenge himself against Jordan, there was sufficient time for an average person to have cooled off and regained his self-control between the brief fight with Jordan and the random shooting into the crowd of innocent bystanders. According to the witnesses, approximately ten to fifteen minutes elapsed between the two events. Cf. State v. Clark, 93-2090 (La.App. 4th Cir. 5/17/94), 637 So.2d 1140, 1142-1143; State v. Lindsey, 90-1602 (La.App. 4th Cir. 1/13/94), 631 So.2d 486, 489; State v. Willis, 552 So.2d 39, 45 (La.App. 3rd Cir.1989), writ denied, 560 So.2d 20 (La.1990); State v. Cheatham, 519 So.2d 188, 190-191 (La.App. 4th Cir.1987), writ denied, 523 So.2d 228 (La.1988). Under the circumstances of this case, the second degree murder verdict did not constitute error.
The assigned error lacks merit.

ERROR PATENT
By the last assignment of error, appellate counsel asks that this court examine the record for patent error. This court routinely reviews the record for errors patent, whether or not such a request is made by a defendant. Under La.C.Cr.P. art. 920(2), we are limited in our patent error review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. After a careful review of the record in these proceedings, we have found no reversible patent errors. However, in reviewing the minutes of the sentencing proceeding, we have found a potential error in the sentence imposed. The defendant was not afforded credit for time spent in custody awaiting trial in accordance with La.C.Cr.P. art. 880. The transcript of the sentencing proceeding is not contained in the record to enable us to determine whether the minutes contain a clerical error or whether they accurately report what transpired at the sentencing proceeding. As the defect does not warrant a remand for resentencing, we order that the defendant be given credit for time served and that the district court amend the commitment, if necessary. See La.C.Cr.P art. 882.
We have found no other patent errors.
CONVICTION AFFIRMED. SENTENCE AFFIRMED AS AMENDED AND REMANDED WITH ORDER.
NOTES
[1] Judge Hillary J. Crain, retired, and Judge Thomas W. Tanner, retired, are serving as judges pro tempore by special appointments of the Louisiana Supreme Court.