960 So.2d 208 (2007)
STATE of Louisiana
v.
Vincent Ray VERRET.
No. 2006 KA 1337.
Court of Appeal of Louisiana, First Circuit.
March 23, 2007.
*211 Carlos E. Lazarus, Jr., Ellen Daigle Doskey, Assistant District Attorneys, Houma, Counsel for Appellee State of Louisiana.
Douglas H. Greenburg, Houma, Counsel for Defendant/Appellant Vincent Ray Verret.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
McCLENDON, J.
Defendant, Vincent Ray Verret, was charged by grand jury indictment with one count of aggravated rape, a violation of LSA-R.S. 14:42, and pled not guilty. Following a jury trial, he was found guilty as charged. Defendant moved for a new trial and a post-verdict judgment of acquittal, but the motions were denied. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant then moved for reconsideration of sentence, but the motion was denied. He now appeals, designating six assignments of error. We affirm the conviction and sentence; we also issue a protective order.

ASSIGNMENTS OF ERROR
1. The trial court erred in granting the State's motion requesting that the court order defendant to undergo examination by an expert psychologist chosen by the State.
2. The trial court committed reversible error in allowing the State to admit defendant's confession into evidence over the objection of defendant.
3. The trial court erred in admitting evidence of other offenses which were the subject of pending indictments against defendant.
4. The trial court erred in overruling defendant's motion for post-verdict judgment of acquittal because no rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt.
5. The trial court erred in failing to grant a mistrial following the late production by the State of the report of the Lafourche Parish Sheriff's Office.
6. Defendant was denied the effective assistance of counsel in the preparation and presentation of his defense.

*212 FACTUAL BACKGROUND
The victim, M.T.,[1] whose date of birth is May 16, 1993, testified at trial. When she was eight years old, she lived with defendant, her father, for approximately one and one-half years. M.T. testified that during that time, defendant raped her. M.T. defined rape as when defendant would put his "private" in her "private parts" "in the front and in the back." She also testified that defendant would make her suck his private.
M.T. discussed the first time defendant raped her. While she was washing dishes in the kitchen, defendant called her into the bathroom. Defendant told M.T. that she needed to clean the bathroom. While M.T. was picking up clothes, defendant told her to pull down her pants. M.T. initially refused, but after defendant repeated the demand, she pulled down her pants. Defendant forced the victim to get on her hands and knees and then "stuck his private in [M.T.'s] butt." The rape hurt M.T., and she cried and told defendant "to stop loud." Defendant, however, continued for approximately five minutes.
After the first rape, defendant told M.T. he was sorry and promised never to "do it" again. However, "another time" defendant did the "same thing" to M.T. He also made M.T. suck his private and put his private in her front private. The additional rapes occurred in the living room, the bathroom, M.T.'s room, defendant's wife's room, the victim's brother's room, and the hallway. While defendant raped M.T., he told her "everything he did to little girls[,]" and mentioned the names of "Summer, Tonia, Toni, Shenequea, and Caylie." Defendant told M.T. that she did not want to see him go to jail because she would not have anything. M.T. interpreted defendant's statement to mean that if he were ever released from jail, he would kill her.
On cross-examination, M.T. testified that "Mario" and "Roberto" lived with her mother before she went to live with her father. M.T. could not pronounce Roberto's last name because it was Mexican. She stated that Roberto was her mother's husband and lived with them when M.T. was three or four years old. M.T. did not remember if a public agency had investigated abuse against her by Roberto or any other person before she went to live with defendant. She denied that Roberto or anyone else abused her before she went to live with defendant.
M.T. conceded she saw a psychologist after the rapes, but denied that the psychologist said she was a compulsive liar. M.T. denied telling people in her family that she had been "messed with" by some Mexican or Mexicans prior to going to live with defendant.
The State also played a videotaped statement given by M.T. on March 25, 2003. In the statement, M.T. stated she lived with defendant for the last year and one-half and he had "messed with [her]." M.T. stated that defendant told her never to tell anyone that he "did it to [M.T.]." She indicated the incidents had occurred in the kitchen, the hallway, the victim's room, and defendant's room. She stated that defendant's wife, Stacy, had been shopping, sleeping, at work, or at Bingo during the incidents.
M.T. gave a similar account during her testimony at trial concerning the first rape. She testified that approximately a month after the first rape, defendant began putting his private in her private after making her lay down in her room or in his room. Defendant made M.T. pull her pants down and stood up during the rapes. *213 Defendant would rape her "until white stuff came out," and then would "put it in [M.T.'s] butt." Defendant told M.T. not to tell anyone about the rapes, and M.T. did not tell anyone because she was scared of defendant. She testified that defendant raped her more than one hundred times, and raped her every day except Sunday, because on Sunday they went to church and then to her grandmother's house. M.T. denied that anyone other than defendant did what defendant had done to her.
The State also played an audiotaped statement given by defendant to Terrebonne Parish Sheriff's Detective Dawn Bergeron on March 26, 2003. Defendant claimed M.T. lived with him for eight or nine months in 2000. Detective Bergeron told defendant that his daughter had made allegations that he had touched her inappropriately and asked him if he knew what that meant. Defendant replied, "touched her privates." He confessed to four incidents involving M.T. when she was eight or nine years old. He claimed the first incident occurred in the living room of his house, and he put his private in M.T.'s butt. He also stated that M.T. gave him oral sex. Defendant initially denied also vaginally raping M.T., but then conceded his private parts had touched M.T.'s vagina twice. He initially denied ejaculating during the rapes, but after Detective Bergeron told him that M.T. indicated that he did ejaculate, he stated he ejaculated as he exited M.T.'s body. Defendant claimed he told the victim to "help him pray so that he wouldn't do it." He denied raping any other children.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number 4, defendant argues that M.T.'s testimony was unsupported by physical evidence and was insufficient to prove guilt beyond a reasonable doubt. He claims that M.T. had a history of making allegations against adult males, which lacked credibility. In regard to what he calls his "purported" confession, defendant claims the evidence of his mental disability and the inconsistency of the confession with M.T.'s statement were sufficient to create a reasonable doubt in the mind of any rational trier of fact.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).
Louisiana Revised Statute 14:41, prior to amendment by 2001 La. Acts, No. 301, § 1, in pertinent part, provided:
A. Rape is the act of anal or vaginal sexual intercourse with a . . . female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
Louisiana Revised Statute 14:42, prior to amendment by 2001 La. Acts, No. 301, § 1, and 2003 La. Acts, No. 795, § 1, in pertinent part, provided:
A. Aggravated rape is a rape . . . where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
. . .
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
*214 After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that defendant was guilty of the aggravated rape of M.T. The verdict rendered against defendant indicates the jury accepted the testimony of the State's witnesses, including M.T.'s account of the incident. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Lofton, 96-1429, p. 5 (La.App. 1 Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La.10/17/97), 701 So.2d 1331.
This assignment of error is without merit.

EXAMINATION OF THE DEFENDANT BY A STATE EXPERT
In assignment of error number 1, defendant argues that the trial court erred in ordering him to undergo psychological evaluation by an expert chosen by the State where there was no statutory authority for such an examination, and he had not pled insanity at the time of the offense or lack of capacity to understand the proceedings against him or assist in his defense.
Prior to trial, the defense moved to suppress defendant's confession, alleging, inter alia, that defendant was "mentally handicapped and therefore was not of sound mind and did not have the mental capacity to adequately understand and appreciate his rights or to be able to intelligently and voluntarily waive same."
The State moved for a contradictory hearing. The State set forth that defendant had put at issue his mental condition and capacity by alleging that he was retarded, and that retardation prevented him from knowingly and voluntarily waiving his rights when he made an inculpatory statement to law enforcement. The State further set forth that defendant had engaged an expert psychologist to provide expert testimony at the hearing on the motion to suppress the confession. The State moved to have defendant examined by an expert psychologist of its choice.
At the hearing on the motion, the defense argued that it had not placed defendant's mental condition at issue, and thus, the State had no right to engage in discovery of defendant's mental condition for purposes of a motion to suppress a confession. Additionally, the defense argued that the examination of defendant sought by the State would violate defendant's rights against self-incrimination and the effective assistance of counsel.
The trial court granted the motion to have defendant examined by an expert psychologist chosen by the State for the purpose of assessing defendant's level of intelligence or mental ability. The court noted:
It seems that a resolution of the issue raised by the [S]tate in this case should be resolved by reference to the procedural articles dealing with discovery and inspection. Although Louisiana Code of Criminal Procedure article 726 grants the [S]tate a limited right to inspect and reproduce reports of mental and physical examinations the defendant intends to use at trial, it does not grant the *215 [S]tate the right to a physical or mental examination of the defendant by experts.
This court believes it would be fundamentally unfair to permit the defendant to present at the hearing on his motion to suppress his confession, expert testimony about his diminished mental capacity, and yet deny the [S]tate the opportunity to have its own expert examine the defendant and testify about the same matter. The discovery sought by the [S]tate is not designed to obtain and will not result in the obtaining of admissible testimonial evidence at trial. The discovery is designed to obtain evidence to resolve the issue of the defendant's level of intelligence, an issue raised by the defendant in connection with his attempt to resolve the pre-trial issue of the admissibility of his confession or other inculpatory statements.
The court considers the evidence the [S]tate intends to obtain by way of the requested examination of the defendant, as non-testimonial evidence, akin to other types of evidence that a defendant may be compelled to produce without violation of his privilege against self-incrimination. These include bodily fluids, handwriting samples, and exhibition of physical traits such as voice, scars, height, and physical appearance. State v. Tillett, 351 So.2d 1153 (La.[]1977). In this case, although the defendant may be required by the professional examiner to answer questions, that does not render the evidence obtained, i.e., the level of his intelligence, "testimonial." The answers to the questions will not constitute the evidence. Rather the evidence will be the level of his mental abilities as reflected by the answers to the questions.
Defendant moved this court to issue supervisory writs and reverse the ruling of the trial court. Writs were denied. State of Louisiana ex rel. Vincent Ray Verret v. State of Louisiana, 04-0921 (La.App. 1 Cir. 5/4/04) (unpublished writ action).
In an appeal of an issue of this nature, judicial efficiency demands that this court accord great deference to its pretrial decision on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result. State v. Haynes, 99-1973, p. 9 (La. App. 1 Cir. 6/23/00), 762 So.2d 1247, 1253, writ denied, 00-2243 (La.6/15/01), 793 So.2d 1236. A thorough review of the record indicates the pretrial determination of this court concerning the challenged trial court ruling was not patently erroneous and did not produce an unjust result. In his motion to suppress his statement, defendant raised the issue of his mental condition and capacity at the time of his inculpatory statement and further sought to introduce his own expert testimony on this issue. There was no abuse of discretion in granting the State the opportunity to have its own expert examine defendant so that the State could challenge the testimony of the defense expert that retardation prevented defendant from knowingly and voluntarily waiving his rights when he made his inculpatory statement. See Commonwealth v. Ostrander, 441 Mass. 344, 354, 805 N.E.2d 497, 505-06, cert. denied, 543 U.S. 867, 125 S.Ct. 210, 160 L.Ed.2d 113 (2004) ("We reject the defendant's narrow interpretation of the relevant case law, because it does not take into account that it is the defendant who is placing his mental state at issue, and the challenged mental state does not concern a collateral issue, but rather a defense set forth by the defendant. Furthermore, such an interpretation would be fundamentally unfair to the Commonwealth, permitting a one-sided presentation of expert evidence not *216 only to the motion judge, but also to the jury who must find that the confession was voluntary beyond a reasonable doubt. Permitting only one party to introduce expert testimony on a crucial issue would have a `distorting effect on the fact finder's role,' and undermine `society's conduct of a fair inquiry.' It would be both `unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony. The principle also rests on `the need to prevent fraudulent mental defenses.'" (Citations omitted)).
There was also no abuse of discretion in the trial court's rejection of defendant's claims that granting the State's motion violated his rights against self-incrimination and the effective assistance of counsel. See State v. Breaux, 337 So.2d 182, 186 (La.1976) (on rehearing) ("Likewise, we reject appellant's claim of a constitutional right to have an attorney present at the psychiatric examination since that might defeat the purpose of the examination and since the examination is not the kind of critical stage at which assistance of counsel is needed or even useful. There would be no need for counsel to instruct the accused not to answer questions for fear of factual self-incrimination, for any such matter is subject to suppression; and interference with the examination by counsel on other grounds would be improper.") (quoting United States v. Cohen, 530 F.2d 43, 48 (5th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976)).
This assignment of error is without merit.

MOTION TO SUPPRESS CONFESSION
In assignment of error number 2, defendant contends he was incapable of giving a knowing and intelligent waiver of his rights and equally incapable of giving a free and voluntary confession.
It is well settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. Additionally, the State must show that an accused who makes a statement or confession during custodial interrogation was first advised of his Miranda rights.[2]State v. Plain, 99-1112, p. 5 (La. App. 1 Cir. 2/18/00), 752 So.2d 337, 342.
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether or not a confession is admissible. Plain, 99-1112 at p. 6, 752 So.2d at 342.
Prior to trial, defendant moved to suppress for use as evidence his confession. He alleged he was mentally handicapped, and therefore, not of sound mind, and did not have the mental capacity to adequately understand and appreciate his rights or to be able to intelligently and voluntarily waive those rights. Following a hearing, the motion was denied.
Terrebonne Parish Sheriff's Office Detective Dawn Bergeron testified at the motion *217 to suppress. She testified that on March 26, 2003, she went to the residence of defendant and, at her request, he accompanied her back to the sheriff's office. Detective Bergeron advised defendant of M.T.'s allegations against him, specifically that he had anally raped her, had oral sex with her against her will, and had vaginal sex with her against her will. Defendant denied he had committed any of the alleged acts. Detective Bergeron asked defendant to take a lie-detector test and he agreed. However, Detective Bergeron learned that the test could not be performed at that time and advised defendant of that fact. In response to questioning from Detective Bergeron, defendant indicated that the highest grade he had completed was the sixth grade and he could not read or write. He indicated that he was not a smart person and that sometimes things were difficult for him to understand. He also indicated he had been receiving social security disability payments for a learning disability.
Detective Bergeron read each of defendant's Miranda rights to him and, additionally, explained each right in simpler terms. She advised defendant that he had the right to remain silent, meaning he did not have to speak to her. She further advised defendant that anything he said can, and would, be used against him, meaning anything he told her, she could tell to a judge. Detective Bergeron advised defendant that he had a right to talk to a lawyer for advice before the police asked defendant any questions and to have a lawyer with him during questioning, meaning if he would like an attorney or someone there to represent him, the police could arrange that. She further advised defendant that if he could not afford a lawyer, one would be appointed for him before questioning if he wished, meaning if defendant did not have enough money to get an attorney, that was not a problem because the court would give him an attorney. Detective Bergeron advised defendant that if he decided to answer questions now without a lawyer present, defendant still had the right to stop answering at any time. She also advised defendant that he had the right to stop answering at any time until he talked to a lawyer. She explained those rights further by telling defendant that he did not have to answer questions now and if he would like to get an attorney or would like the police to get him an attorney, and wait to talk to the police later, he could do that. Defendant initialed the advice of rights form after Detective Bergeron read and explained each of his rights to him. He also signed the form, indicating that he understood the entire set of rights. Detective Bergeron also read and explained the waiver of rights portion of the advice of rights form to defendant and he also signed that section, which stated:
I HAVE READ OR HAD READ TO ME, THIS STATEMENT OF MY RIGHTS. I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.
Detective Bergeron testified that while explaining defendant's rights to him, she never threatened defendant, put him under duress in any way, or promised him anything. She also denied giving defendant any inducement to make a statement. Detective Bergeron indicated the statement given by the defendant was completely and fully voluntary.
*218 Detective Bergeron also testified at trial. At trial, she gave a similar account of advising and explaining defendant's rights to him. She added she began using the waiver of rights form at 9:22 a.m. and finished at 9:25 a.m. She also added that when the defendant told her he was not smart, his exact words were that he was "stupid."
Dr. F.T. Friedberg, an expert in the field of clinical psychology, also testified at the suppression hearing. He indicated that defendant had taken the Wexler Intelligence Scale for Children in 1985 and 1988, and both of those tests found him to be functioning in the mild range of mental retardation, where IQs are below 70. Dr. Friedberg tested defendant with an adult intelligence test in May of 2003, and found defendant to have a full-scale IQ of 53.
Dr. Friedberg also administered memory and design tests to defendant. Defendant had "significant deficit" doing basic geometric figures, which was consistent with his level of retardation. Defendant also did not write in script, which indicated a deficit level in his ability to do academic things and his ability to understand and comprehend. Dr. Friedberg found defendant to be functioning at a first or second grade level and testified that defendant could not read words. Dr. Friedberg stated that the only work defendant had done was simple labor and that defendant did not have a driver's license. Dr. Friedberg indicated that even if someone read to a mentally retarded person, the retarded person still would not understand what had been read to him or her. He also indicated that mentally retarded people had a tendency to want to please people and to acquiesce.
Dr. Friedberg further testified that Dr. Clarence Bergeron, the State's expert, had administered a test to defendant designed to measure a defendant's level of comprehension of individual rights. Defendant scored a zero in regard to the right to remain silent, and thought that if he were asked questions, he had to answer them. Defendant also exhibited less than the mentally retarded person's average ability to understand his right to counsel. Dr. Friedberg opined that defendant did not have the ability to understand his Miranda rights or to knowingly or intelligently execute a waiver of those rights.
When asked if Detective Bergeron's explanation of defendant's rights to him was sufficient to explain those rights so that defendant would understand the rights, Dr. Friedberg replied, "I don't know. Certainly[,] that would not appear to be enough time to be able to do that. I don't know if there would be enough time to do that."
Dr. Friedberg conceded that in his statement, defendant had corrected the police officer questioning him concerning the truth. He also conceded that the comprehension of the individual rights test administered to defendant had tested defendant's understanding of the terms in the waiver form and not the terms used by Detective Bergeron.
Dr. Friedberg also testified at trial and gave testimony similar to the testimony he gave at the suppression hearing. He added that it was "certainly highly improbable" that defendant understood his Miranda rights as explained by Detective Bergeron, if the explanations were given in two minutes. On cross-examination, Dr. Friedberg conceded, however, that defendant should be able to understand "[Y]ou don't have to talk to me." On redirect examination, Dr. Friedberg indicated, because of defendant's mental retardation, that there was a possibility that his confession was false.
*219 Dr. Clarence M. Bergeron, an expert in the field of counseling psychology, also testified at the suppression hearing. He evaluated the defendant and found him to be functioning in the mildly retarded area. Dr. Bergeron indicated that absent an explanation, he did not think that defendant would fully comprehend the rights-waiver form. However, if the form were read and explained to defendant as testified to by Detective Bergeron, defendant would understand the explanation.
Dr. Bergeron administered the Assessing, Understanding, and Appreciation of the Miranda Rights test to defendant. The test covered the language used on the Miranda-rights form, but not the language used by Detective Bergeron in explaining the Miranda rights. The test was also designed for adolescents. Dr. Bergeron indicated that defendant basically exercised his right to remain silent during testing. Defendant would try to do his best on ability tests, but when asked specific questions about the abuse of M.T., he did not want to talk about that topic.
Based on the testimony of Detective Bergeron, a review of defendant's statement, and the testing of defendant, Dr. Bergeron felt that defendant understood that he did not have to talk. Dr. Bergeron also felt that defendant understood his rights when he made his statement.
On cross-examination, Dr. Bergeron conceded that defendant had scored a zero on the ability to understand the right to remain silent portion of the Miranda-rights test. Dr. Bergeron also concluded that defendant had a little less than average ability to understand his right to counsel. He further testified that defendant claimed not to remember placing his initials on the rights-waiver form.
Dr. Bergeron also testified at trial. He gave similar testimony to the testimony he gave at the suppression hearing. He specifically stated that he felt that defendant had voluntarily waived his rights when he made his statement. On cross-examination, Dr. Bergeron indicated it would be very difficult for Detective Bergeron to read and explain the Miranda rights to an illiterate, mentally retarded person in two minutes. On redirect examination, Dr. Bergeron indicated his answer concerning Detective Bergeron reading and explaining Miranda rights would change if the time were four minutes, rather than two minutes.
The trial court denied the motion to suppress the confession. The court listened to the audiotape of defendant's confession and found that nothing on the audiotape indicated that defendant had been mistreated in any way during the interview or had not understood the questions asked of him. To the contrary, the court noted that Detective Bergeron's manner of questioning defendant, her tone, and her reaction to his responses, confirmed that she remained calm and was courteous to defendant during the interview, and that defendant obviously understood her questions.
The trial court determined that defendant's March 26, 2003 statement was voluntary under both constitutional and statutory standards. The court found no evidence to suggest that Detective Bergeron's actions in obtaining the confession were coercive or that defendant's statements were made while he was under the influence of fear, duress, intimidation, menaces, inducements, or promises.
The court also found that defendant knowingly and intelligently waived his Miranda rights. The trial court noted that defendant had been classified as mildly mentally retarded, but felt the significance of that classification was questionable. The court felt that the designation *220 "mildly mentally retarded" reflected the level of one's academic abilities, but did not necessarily reflect an assessment of one's abilities to function, or to comprehend or appreciate particular episodes or events faced during life.
The court noted the fact that initialing and signing the rights-waiver form was not evidence that defendant understood anything reflected on the form. The court was, however, "heavily influenced" by the fact that Detective Bergeron had not simply read the rights-waiver form to defendant, or given the form to defendant to read, but had explained defendant's rights to him in basic terms.
The trial court determined that the totality of the circumstances indicated that defendant had knowingly and intelligently waived his rights. The court noted that when Detective Bergeron began to explain defendant's rights to him, he advised her that he was not very smart, which indicated he understood and appreciated the importance of what Detective Bergeron had to say to him. The court further noted that defendant had initially denied the allegations against him. The court also noted that the audiotape of defendant's confession revealed that defendant was not easily led to respond predictably by leading questions, but to the contrary, his responses appeared to be those of a thinking individual who understood the questions, who responded appropriately, and who was willing to correct any misimpression created by a leading question.
Furthermore, the court did not believe that the amount of time Detective Bergeron devoted to her task with defendant was either so brief, or so drawn out, that in light of all the circumstances of the case, defendant's waiver of rights was constitutionally tainted.
The trial court concluded:
Considering all of the facts described above, this court is satisfied that [defendant], during his interview with Detective Bergeron, exhibited sufficient intelligence, mental agility and adaptability, and reasoning that he easily could have made a knowing and intelligent waiver of his Miranda rights. That factor, together with Detective Bergeron's simple explanation of those rights and the option to waive those rights, convince this court that [defendant] did, in fact, make a knowing and intelligent waiver of his Miranda rights.
Defendant then moved this court to issue supervisory writs and reverse the ruling of the trial court. Writs were denied. State of Louisiana v. Vincent Ray Verret, 05-0605 (La.App. 1 Cir. 4/7/05) (unpublished writ action).
As previously noted, judicial efficiency demands that this court accord great deference to its pretrial decision on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result. Haynes, 99-1973 at p. 9, 762 So.2d at 1253. A thorough review of the record indicates the pretrial determination of this court concerning the denial of the motion to suppress the confession was not patently erroneous and did not produce an unjust result. There was no abuse of discretion in the trial court's denial of the motion to suppress the confession.
This assignment of error is without merit.

OTHER CRIMES EVIDENCE
In assignment of error number 3, defendant argues that evidence of an alleged offense against another victim, T.L., was inadmissible under LSA-C.E. art. 412.2, because its probative value was out-weighed *221 by the danger of unfair prejudice under LSA-C.E. art. 403.
Louisiana Code of Evidence article 412.2 provides:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.
Louisiana Code of Evidence article 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Prior to trial, the State gave the defense notice that the State intended to use evidence in the instant case, pursuant to LSA-C.E. art. 412.2, of other crimes, including similar sexual assault offenses committed by defendant against T.L., whose date of birth was August 4, 1990.[3] Following the selection of the jury, but prior to the presentation of testimony at trial, a hearing was held on the LSA-C.E. art. 412.2 motion. The State presented testimony from T.L.
T.L. testified that she was fifteen years old and that defendant was her cousin. She stated that she was at the hearing because defendant had raped her. The rape occurred in the bathroom of defendant's house when T.L. was approximately ten years old. She thought it occurred during the summer. Defendant repeatedly came into the bathroom while T.L. was taking a bath. Defendant then came into the bathroom and told T.L. she could get out. As T.L. got out of the bathtub, a shampoo bottle fell, and T.L. bent down to pick up the bottle. Defendant touched T.L.'s "butt." T.L. was scared by defendant's action. Defendant asked her to get on the toilet, and T.L. got on her knees. She was crying and asked the defendant, "[P]lease, no." Defendant told T.L., "[I]t's only going to take five minutes." T.L. cried out for help, but defendant covered her mouth with his hand and told her he would kill her. Defendant told T.L. to kneel on the toilet. Defendant then pushed his "private part" into T.L.'s butt. He then forced T.L. to sit on the bathtub and suck his private.
The trial court held that evidence with regard to the incident described by T.L. would be permitted, subject to whatever cross-examination or other evidence defendant wished to offer. The defense objected to the court's ruling.
The court found that the evidence concerning the incident involving T.L. was *222 relevant, because it involved evidence of defendant's lustful disposition toward a young child, which was relevant to a disposition of the present charge of aggravated rape of a young child. The court noted the charged offense against M.T. occurred shortly before the incident involving T.L. At that time, defendant was an adult.[4]
The court also found that the evidence concerning the incident with T.L. was not unfairly prejudicial and that the admission of the evidence would not confuse the issues or mislead the jury or amount to an undue delay or waste of time. The court noted the incidents involving M.T. and T.L. were separate incidents involving separate children, and the court did not believe there was any risk the jury would be misled or confused as a result of the testimony regarding either incident.
There was no error in the trial court's ruling on the LSA-C.E. art. 412.2 motion. The evidence concerning the incident with T.L. was admissible under LSA-C.E. art. 412.2, and the probative value of the evidence was not outweighed by the danger of unfair prejudice under LSA-C.E. art. 403.
This assignment of error is without merit.

BRADY VIOLATION; DENIAL OF MISTRIAL
In assignment of error number 5, defendant argues the trial court erred in denying a mistrial on the basis of the State's failure to disclose Brady material until after the defense had rested.
The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Favorable evidence includes both exculpatory evidence and evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant's guilt or innocence, or when it may have a direct bearing on the sentencing determination of the jury. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citing Bagley, 473 U.S. at 682, 105 S.Ct. at 3383). Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434, 115 S.Ct. at 1566; Bagley, 473 U.S. at 678, 105 S.Ct. at 3381.
*223 As is pertinent here, LSA-C.Cr.P. art. 775 provides that a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, a mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Determination of whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for a mistrial will not be disturbed on appeal without abuse of that discretion. State v. Berry, 95-1610, p. 7 (La.App. 1 Cir. 11/8/96), 684 So.2d 439, 449, writ denied, 97-0278 (La.10/10/97), 703 So.2d 603.
During the recess following the presentation of testimony from the defense, the State advised the trial court that it had received some information from the Lafourche Parish Sheriff's Office regarding an interview by that office with [M.T.] on August 8, 2000. The State advised the trial court that the State did not have the information until after defendant's wife, Stacy Verret, testified after being called by the defense. The State furnished the information to the defense, and the State and the defense reached both an "agreement" and a "disagreement" concerning the report in question.
Pursuant to the "agreement," the court instructed the jury as follows:
[A]fter we recessed, I was advised by the Terrebonne Parish District Attorney's Office that it had received a report from the Lafourche Parish Sheriff's [O]ffice regarding an interview that was conducted by the Lafourche Parish Sheriff's [O]ffice with [M.T.] on August the 8th, 2000.
The attorney for [defendant] and the prosecutors in this case have agreed to a stipulation. A stipulation is nothing more than an agreement that's been reached by the parties and you are to consider the stipulation as evidence in this case. So even though you have heard all of the evidence by way of the testimony of the witnesses and the other documents and items that might have been introduced into evidence, and even though I told you that was all the evidence you would hear, you will hear now one additional bit of evidence and it is this stipulation or this agreement that the attorneys have agreed should be revealed to you.
They have also agreed that I am to advise you that this information that is being furnished to you in just a minute, by way of this stipulation, is information that came to the attention of the District Attorney's office only this morning. In fact it did not come to the attention of the District Attorney's office until after Stacy Verret testified.
So, that being said, I'm going to read to you from a Lafourche Parish Sheriff's [O]ffice police report dated August the 8th, 2000. It is a report of an interview conducted by a Detective Tullis with [M.T.].
And this is what the police report says in part. "At 10:45 a.m. Detective Tullis asked [M.T.] if she knew the difference between a good touch and a bad touch. [M.T.] was able to establish the difference by saying that if someone was to touch her on her "lu-lu" it would be a bad touch. Detective Tullis asked [M.T.] if anyone has ever touched her on her "lu-lu[.]" [M.T.] stated that Eric[a]'s husband, Roberto, had touched her there a long time ago but he was shipped back to Mexico. [M.T.] stated that he stuck his finger in her private and then put his private in her butt. [M.T.] stated that her sister, [J.], lied *224 and told her dad Joseph that somebody did something to her. [M.T.] stated that Erica was the one who told her that [J.] lied when she talked to her on the phone last night. [M.T.] denies that anything happened to her or [J.] [M.T.] stated that Chemino doesn't live with them. He just sleeps there because they don't have enough room in his house. [M.T.] state[d] [J.] told Erica that Chemino had touched her. [M.T.] stated that she did tell Erica when Roberto had touched her but told Erica that she did not want to go to the hospital. After [M.T.] told Erica about Roberto, Erica made him leave. [M.T.] stated that "I wish my real daddy would go back with my momma so she'll stop dating Mexicans because I doesn't even know how to speak English any more."
The disagreement concerned the following two paragraphs from the police report, which the defense asked to be revealed to the jury, but the trial court refused to reveal absent an agreement between the State and the defense:
ON August 8, 2000, AT 8:30 AM, MS. CROCHET STATED THAT [J.] WAS USING THE BATHROOM WHEN SHE STATED THAT IT BURNED WHILE SHE URINATED. MS. CROCHET STATED THAT SHE THEN ASKED [J.] IF ANY THING HAD HAPPENED TO HER OR IF ANY ONE HAD HURT HER. [J.] ADVISED HER THAT WHILE AT HER MOTHER'S HOUSE, CHIMINO WENT INTO THE BATHROOM WITH HER SISTER [M.T.]. [M.T.] WAS USING THE BATHROOM WHEN [J.] OBSERVED CHIMINO MESSING WITH HER AND [M.T.] WAS TELLING HIM TO STOP. [J.] THEN STATED THAT CHIMINO TOLD HER TO GO IN THE LIVING ROOM. [J.] STATED THAT WHEN CHIMINO CAME INTO THE LIVING ROOM HE MADE HER LAY ON THE FLOOR AND HE PULLED DOWN HER PANTIES AND STUCK HIS FINGER IN HER VAGINA.
. . .
[J.] STATED THAT CHIMINO TOUCHED HER ONE TIME, BUT TOUCHED HER SISTER, [M.T.], TWO TIMES WHILE [M.T.] WAS IN THE BATHTUB. [J.] STATED THAT CHIMINO TOUCHED HER AND [M.T.] WHILE HER MOTHER, ERICKA, WAS AT WORK. [J.] STATED THAT SHE CRIED WHEN CHIMINO TOUCHED HER AND SHE TOLD HIM TO STOP. [J.] STATED THAT HE THEN STOPPED. [J.] ALSO STATED THAT CHIMINO TOUCHED [M.T.] IN A BAD SPOT WITH HIS FINGERS. [J.] SAID THAT WHEN ERICKA FOUND OUT WHAT HAPPENED AFTER RETURNING FROM WORK, SHE HIT CHIMINO.
Defense counsel indicated he believed the police report was obvious Brady material, and ". . . I have no reason to disbelieve it was just received by the District Attorney's office and supplied to us once received, even thought [sic] it's at a late time, the defense would move for a mistrial at this point based on this issue right here alone." The trial court denied the motion for mistrial and permitted the State to respond to the motion.
The State set forth that during her testimony, Stacy Verret indicated M.T. had been taken to the Lafourche Parish Sheriff's Office where she gave a statement and Verret then described the contents of that statement. Following Verret's testimony, the State contacted the Lafourche Parish Sheriff's Office to determine whether, in fact, the referenced report was made, and *225 if the report was made, to request that a copy of the report be faxed to the State immediately. The report was received by the State shortly before the defense rested, and the State did not finish reviewing the report until the recess after the defense rested. Upon learning that the report contained possible Brady material, the State disclosed the report to the court and to the defense.
In the instant case, there was no abuse of discretion in the denial of the motion for mistrial. Defendant did not suffer such substantial prejudice that he was deprived of any reasonable probability of a fair trial. The State did not suppress evidence favorable to defendant. Pursuant to the "agreement" between the State and the defense, the trial court instructed the jury that on August 8, 2000, M.T. reported being anally raped by "Roberto."
This assignment of error is without merit.

INEFFECTIVE ASSISTANCE OF COUNSEL
In assignment of error number 6, defendant argues "the cumulative acts of omission by trial counsel, which are evident on the face of the record and cannot be explained as indicative of trial strategy," denied him the effective assistance of counsel. Defendant complains: trial counsel did not call him to testify at the hearing on the motion to suppress; trial counsel failed to cross-examine Detective Bergeron about the pre-interview she conducted with him; trial counsel failed to object to the testimony of Terri Francis and Emily Liner; trial counsel failed to object to certain testimony from Dr. Bergeron; and trial counsel failed to request that the entire report from the Lafourche Parish Sheriff's Office be introduced into evidence and failed to ask for a recess to obtain a copy of the audiotaped interview of M.T. referenced in the report.
A claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. State v. Miller, 99-0192, p. 24 (La.9/6/00), 776 So.2d 396, 411, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001).
A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that his trial attorney was ineffective, the defendant must first show that the attorney's performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. Secondly, the defendant must prove that the deficient performance prejudiced the defense. This element requires a showing that the errors were so serious that defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted. It is not sufficient for defendant to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that but for the counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Further, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components. State v. Serigny, 610 So.2d 857, 859-60 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1263 (La.1993).
In the instant case, an evidentiary hearing would be required to determine whether or not defendant's trial counsel's allegedly deficient performance was strategic.[5] *226 See State v. Allen, 94-1941, p. 8 (La.App. 1 Cir. 11/9/95), 664 So.2d 1264, 1271, writ denied, 95-2946 (La.3/15/96), 669 So.2d 433. Under our adversary system, once a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, which must be made before and during trial rest with an accused and his attorney. The fact that a particular strategy is unsuccessful does not establish ineffective assistance of counsel. State v. Folse, 623 So.2d 59, 71 (La.App. 1 Cir.1993).
This assignment of error is without merit or is otherwise not subject to appellate review.

PROTECTIVE ORDER
Louisiana Revised Statute 15:440.6 requires that a videotape of a child's statement admitted under LSA-R.S. 15:440.5 be preserved under a protective order of the court to protect the privacy of the child. The trial court failed to issue such an order in this case. Accordingly, it is hereby ordered that State Exhibit # 1, the videotaped statement of M.T., and any copies thereof be placed under a protective order.[6]See State v. Ledet, 96-0142, p. 19 (La.App. 1 Cir. 11/8/96), 694 So.2d 336, 347, writ denied, 96-3029 (La.9/19/97), 701 So.2d 163.
CONVICTION AND SENTENCE AFFIRMED. PROTECTIVE ORDER ISSUED.
NOTES
[1] The victim is referenced herein only by her initials. See LSA-R.S. 46:1844(W).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] T.L. was the victim in State v. Vincent Ray Verret, Thirty-second Judicial District Court, Docket # 411,019 and #410,994.
[4] In contrast, the trial court held that testimony from C.L. that defendant touched her "bottom area" when she was four or five years old and when he was approximately eleven years old was inadmissible because, at most, the evidence showed defendant's lustful disposition toward young girls when he was a child.
[5] Defendant would have to satisfy the requirements of LSA-C.Cr.P. art. 924, et seq., in order to receive such a hearing.
[6] The appellate record contains State Exhibit # 2, a DVD-R disc containing a copy of the videotaped statement of M.T., which is also subject to the protective order.