STATE OF LOUISIANA

VERSUS

ROBERT JAMES JACOBS

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, DOCKET NO. 299,808
HONORABLE JOHN DAVIDSON, PRESIDING
**********

SYLVIA R. COOKS
JUDGE
**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Jimmie C. Peters, Judges.

**AFFIRMED, WITH INSTRUCTIONS.**

Peters, J., dissents and assigns written reasons.

G. Paul Marx
Louisiana Appellate Project
P.O. Box 82389
Lafayette, LA 70598-2389
(337) 237-2537
COUNSEL FOR DEFENDANT/APPELLANT:
     Brenda Williams

James C. Downs, District Attorney
Numa V. Metoyer, Assistant District Attorney
Ninth Judicial District Court, Parish of Rapides
P.O. Drawer 1472
Alexandria, LA 71309
(318) 473-6650
COUNSEL FOR APPELLEE:
     State of Louisiana

**COOKS, Judge.**

The facts of this case indicate on the morning of May 2, 2008, a dispute began between the victim, Marcus Malone, and his sister, Kristy Jacobs. Mrs. Jacobs left the residence. After learning of the argument, Defendant, Robert James Jacobs, decided to leave work and return to the residence. When he arrived at the residence, Mr. Malone was present pacing in the yard. Mr. Jacobs went inside and began to gather his family's belongings to put in the trunk of a car. In the trunk of his car was a rifle. He made several trips inside the residence to retrieve his family's belongings while Mr. Malone paced about the yard. At some point, while he was loading his family's belongings into the car, Mr. Jacobs alleged that Mr. Malone had a gun and was approaching him, so he pulled the .22 rifle from the trunk of the car and fired it at Mr. Malone. The incident resulted in permanent harm to the victim, leaving him a quadriplegic. Mr. Jacobs denied having a gun, and no other gun was found at the residence.

On November 17, 2009, the State charged Defendant with one count of aggravated second degree battery. After Defendant's trial, the jury returned a responsive verdict of "Guilty of Second Degree Battery," in violation of La.R.S. 14:34.1. Subsequently, the district court conducted a sentencing hearing and ordered Defendant to serve five years at hard labor with credit for time served.

Defendant now appeals. For the following reasons, we affirm Defendant's conviction and sentence.

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find Defendant was not informed of the two-year time limit for filing post-conviction

relief as required by La.Code Crim.P. art. 930.8. Thus, the district court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *See State v. Fontenot*, 616 So.2d 1353 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1334 (La.1993); *State v. Courtney*, 99-1700 (La.App. 3 Cir. 5/3/00); 761 So.2d 112.

## ASSIGNMENT OF ERROR NO. 1

Defendant argues in his first assignment of error the following:

> The trial court erred by failing to declare a mistrial sua sponte and in the alternative by failing to declare a mistrial on motion of the defendant under the provisions of Code of Criminal Procedure Article 775. The loss of critical evidence fatally impaired a fair trial, including the revelation of photographs for the first time during trial and the loss of impeachment evidence that would have supported reasonable doubt. Alternatively, the verdict is based on insufficient evidence considering the impact of lost exculpatory materials and must be reversed as in violation of Due Process of Law.

### A. *Sufficiency of the Evidence.*

Though Defendant phrases part of this assignment of error as an insufficiency of the evidence claim, Defendant does not brief this issue. His brief fails to argue that there was insufficient evidence to support his conviction or that the State failed to adequately prove any element of second degree battery. Therefore, under Uniform Rules—Courts of Appeal, Rule 2-12.4, this specification of error is considered to be abandoned.

### B. *Mistrial/Due Process.*

Defendant contends the record shows that the investigation of the crime and collection of evidence was severely deficient. The State mishandled, misplaced, and lost items in evidence. He argues, even without any malicious intent, the loss of evidence prejudiced his case. Defendant asserts this is evident because the

3

prosecution was unable to provide the defense with a large number of crime scene photographs until midway through trial. Defendant also urges that the prejudice to his case was demonstrated by the loss of the audio recordings of the statements given by witnesses present at the crime scene. He argues this deprived the defense of evidence that would have allowed it to impeach the prosecution's witnesses at trial. Defendant contends, therefore, that the State was allowed to proceed with an unfair advantage at trial, and there can be no confidence in the jury verdict. Defendant further asserts the loss of evidence violated his due process rights because the reckless disregard for procedure and preservation of the evidence did not fit within the good faith exception set forth by the Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333 (1988).

The State responds that the trial court determined the defense had not been prejudiced in a manner sufficient to support a mistrial. The decision rests on the sound discretion of the trial court and cannot be overturned absent an abuse of that discretion under *State v. Ennis*, 03-1491 (La.App. 3 Cir. 7/7/04), 877 So.2d 300.

The State points out that it was not aware of the existence of the photographs until trial was underway. The State adds that the prosecution and the defense discovered the photographs contemporaneously and that they were entered into evidence without objection by the defense. The State maintains the defense was not prevented from impeaching the witnesses because transcripts of the statements were available for cross-examination purposes, although the digital recordings had been purged. Finally, the State asserts because none of the evidence was exculpatory in nature, providing the evidence earlier would not have altered the outcome of the trial.

Defendant's first reference to the trial transcript that concerns the missing materials occurred during the direct examination of Officer Ephraim Keller. The

4

colloquy appears immediately following the officer's testimony that Defendant had given a voluntary statement to the police, wherein he claimed that he had shot the victim in self-defense:

Q. Okay. And were you aware of a statement that was taken from Mr. Jacobs by Assistant Chief Jeter?

A. Jeter told me did a, ah, written statement and he said he also recorded a statement from 'im.

Q. And do you have any knowledge whatsoever as to the whereabouts of those statements?

A. No.

Q. All right. What . . . do you, know, ahm, are the statements lost?

A. Yeah. They got to be, 'cause I haven't seen 'im, and they was . . . all of that was supposed to'a been with the stuff we turned in.

Q. Okay. And at the time that those things were tendered to the Rapides Parish District Attorney's Office, all right, there was no statement by the Defendant in there, was there?

BY MR. MURRY: Objection. Your Honor, I don't . . . well, I (trails off). Ah, he may have . . . if he could just ask 'im if he knows whether they were in there or not.

BY THE COURT: I'm gonna overrule the objection.

Q. Was, was the Defendant's statement tendered to the Rapides Parish District Attorney's Office?

A. I couldn't tell you if it was or not, to be honest.

Q. Right. Do you recall the first time the statement became an issue to the investigation?

A. Yeah, yeah.

Q. When was that?

A. I think the last month.

Q. Ah, maybe a month or so ago?

A. Umm, hmm.

Q. All right. And that is when you became aware that the statement wasn't there?

A. Right.

The second transcript location cited by the defense references the cross-examination of Jessica Stelly:

A. No sir, he didn't have a gun.

Q. I think you said in your statement that if, if he had had it, it would've (interrupted)

A. I said if he would have had a gun, he would have shot him.

Q. Shot Robert.

A. Yes.

Q. Now you said, ah, when you got there . . . this is your statement from May 5th, 2008. Ah, do you remember saying: "So my brother was standing right there. When we got to the corner, he told 'er, "just stay there. Your husband right here, he right here, don't come down this way. We pass through here, he gonna get hurt.'" Do you recall saying that?

A. He said she was gonna get hurt. He said if she come in the yard, he was gonna slap her. He didn't say anything about Robert Jacobs.

Q. Could you read that, startin' right there?

A. "Your husband is ri, your husband right here. He right here. Don't come down this way." That's what he said.

Q. "We pass through here, he (interrupted)

A. "We pass through here (interrupted)
Q. . . . gonna get hurt."

A. I didn't say that.
Q. Okay. So the . . . do you think they typed it wrong?

A. They had to; I didn't say that.

Q. Okay. And did you say, on the next page, page two, ah: "My brother was talking to me about them, he was mainly saying my sister Kristy, and he said: 'I wouldn't hurt none of my sisters,' he say, 'but your husband's standing here. Y'all think I'm

6

playing with y'all', and that's what he said." Does that sound familiar?

A.     No sir.

Q.     Not what you said?  You didn't say (interrupted)

A.     He said (interrupted)

Q.     You didn't say that either?

A.     . . . I'm a man of my f-ing word.  If you come in the yard, he was gonna slap her.  He said she was gonna get hurt if she come in the yard.

Q.     So, I wanta give you an opportunity to see this statement and tell us (interrupted)

A.     Umm hmm.

Q.     . . . if this is your statement.  Could, ah . . . would you like to read it yourself?

A.     Yes sir.

Q.     Okay.  You wanta read it out loud?

A.     "My brother was talking to me about them.  He was mainly saying my sister Kristy, and he said, "I wouldn't hurt none of my sisters".  He say, "but your husband is standing here.  Y'all think I'm playing, y'all', that's what he said."  He didn't say he was gonna do anything to Robert Jacobs.  This part, y'all . . . he said, your husband is standing here.  He was telling her that both of them didn't have to come in the yard at the same time.  He said: "I'm a man of my word, if you come in the yard", he was gonna slap her.

Q.     Right.

A.     He didn't say nothin' about Robert.
Q.     Right.  Okay.  But, so you did, he did, he did say, he said: "I wouldn't hurt none of my sisters", he say, "but your husband is standing here, y'all think I'm playin".

A.     He didn't say that like, like you're saying it.

Q.     Did I read it . . . did I not read the words?

A.     Yeah, you read the words.

7

Q.	Okay.  Ah, and I'm not talking about what he was sayin', I'm, I'm talking about what you told (interrupted)

A.	Umm hmm.

Q.	. . . the Sheriff's Deputies.

BY MR. METOYER:	I'd like to object, Mr. Murry is putting emphasis on the words to try to make (interrupted)

. . . .

BY MR. METOYER:	Mr. Murry is trying to place emphasis on the words to make the witness's testimony sound different to what her testimony was.

. . . .

BY THE COURT: I, my impression was he . . . she's saying she didn't say what he's reading to her.

BY MR. METOYER:	Right.  And, ah, and in the manner in which he's reading [it] to 'er as well.

BY THE COURT: Well, I'm not, I . . . we don't even go there is she's saying she didn't say what he's reading to her.

BY MR. METOYER:	Right.

BY THE COURT: So I'mma overrule the objection.

Q.	Okay.  So he didn't say he was gonna hurt Robert, he might hurt Kristy, is that right?

A.	He said if she come in the yard, he was gonna slap her.

Q.	Okay.  And, I'm looking at, this is page four now, and we're down here, and this . . . is this your statement?  "He told him, he say, ah, 'I'm a man of my word', he say, 'he told Kristy, if you come down here, I'm gonna hurt him'".  Is that what you said?

A.	No sir, I didn't say nothin' about Robert.  He did say Kristy, (interrupted)

Q.	Okay.

A.	. . . he didn't say anything about Robert.  I never told anybody that he said he was gonna hurt Robert.  He never said that.

Q.	Okay.

A. He just wanted her not to come in the yard at the same time with Robert Jacobs.

Q. So, this is not the words of your statement?

A. That "him", I said this, but I didn't say him.

Q. Okay. Which part is not your words?

A. "Him", I said "her".

Q. Okay.

A. He was talking directly to Kristy. After Kristy backed up, he didn't say anything else to Kristy.

Q. All right. But you did say this part, ah: "Kristy, if you come down here, I'm gonna hurt . . .", you said that much, right?

A. Her. Yes sir.

. . . .

A. He said I'm gonna hurt Kristy. He was talking to Kristy. He was gonna hurt her. I'm saying "her", but to her it would be you. If he said it, it would be you.

. . . .

Q. All right. And then did, did you say this: "He told Kristy if she come down here that somebody was gonna get hurt. He was a man of his word."

A. Yes he did say that.

Q. So that's a promise to hurt somebody.

A. Yes, if she come in the yard.

Defense counsel continued questioning the witness about whether she had said other things during that statement and made comments during a later statement. Ms. Stelly denied making most of the statements.

Following Ms. Stelly's testimony, the parties discussed the missing evidence during a bench conference. The defense said it had just received twenty-two additional photographs and that nearly all of them had useful information. The

9

State explained that it had given the defense all of the photographs it had; it was unaware that there were additional photographs. The photographs came to the State's notice after the defense questioned Detective Jones about whether there were additional photographs. Although he was not aware of more photographs at the time, Detective Jones said he was willing to send someone to check the office and put them on disk for the defense. As a result, additional photographs were provided to both the defense and the prosecution. The State asserted there was no unfair surprise as the photographs just illuminated the scene and did not change the facts or the argument of the case.

When the trial court inquired how the photographs aided the defense, defense counsel responded, "I'm not trying to stop the trial. I'm not trying to get a mistrial; I don't want a continuance." The district court then stated that it was bothered by law enforcement's failure to provide all of the information to the prosecutor:

> It bothers me, and everybody knows this, there's no secret, if this were a civil proceeding, you get all the information or you don't use it at trial. Period, end of discussion. I don't understand why this continues to happen, where we, evidence continues to appear, and they're not providing the evidence to the DA's Office. I don't understand what's going on. I have seen no evidence that there's a conspiracy, but I, I . . . it, it's disconcerting to say the least. This is the second trial in a row I'm dealing with this type of an issue. Ah, but this information was not provided to you, I accept Mr. Metoyer at his word that he didn't have the information, didn't know it existed.

The State explained there were a number of items not provided to the prosecution by law enforcement, including Defendant's taped and written statements. The State learned there had been statements given by Defendant because the defense informed the prosecution. Thereafter, the State went to the Sheriff's office looking for Defendant's statements. Though the prosecution

10

looked at the physical evidence there, the photographs "never came up." The State assumed that all of the photographs were in its file.

After additional discussion, the trial court restated that it did not see evidence of a conspiracy; instead, remarking the mistakes seemed to rise from incompetence: "I haven't seen evidence that there is a concerted conspiracy. I have seen evidence of incompetence in handling of the evidence in the case. So if you lose a written and recorded statement of a defendant, . . . that's pretty big. Okay? . . .[T]he only evidence I've seen is of incompetence."

The defense then pointed out that other evidence had been lost, including three or four recorded statements. Defense counsel specifically pointed out that the victim's recorded statement had been lost. The State said this was a mischaracterization of events. It did not seek the recorded statements because it knew there were transcriptions of those statements. The issue had not been broached prior to the bench conference. The defense responded that was not true because he had been seeking the audio of all statements "at least back to the 7th." Defense counsel pointed out that some of the witnesses had denied the statements contained in the transcripts, so he wanted to play the audio for the jury to show that the witnesses had, in fact, made the statements. The State rejoined that the defense was allowed full access to all witnesses and everything the Sheriff's office held.

When the trial court asked for clarification, the defense explained that the digitally recorded audio statements of Jessica Malone Stelly and Kristy Malone Jacobs taken by the Rapides Parish Sheriff's Office had been deleted. The defense had been able to listen to the statements given by other witnesses and compare them with the transcripts of the statements. The transcriptions were fairly accurate, but some alterations were required. Defense counsel had been informed that the Sheriff's office automatically deleted digital information after one year, and one of

11

the officers told him that he had accidentally deleted several statements, as well. The State responded that the defense had been provided transcripts of both the statements and that the prosecution had been open about the automatic purge. Moreover, the State did not have an unfair advantage because it did not have access to any information in addition to that available to Defendant.

Following the argument by counsel, the trial court discussed the relevant issues on the record:

> BY THE COURT:     I'm not . . . concerned about the State's, or anybody's unfair advantage.  What I'm concerned about is the fact that I'm getting evidence that is relevant to this case - - both sides are getting it - - in the middle of trial.  That's why I am, in my mind considering a mistrial.  That's the problem I have. . . .  I am telling you, I haven't seen any misconduct by the DA's Office. . . .
>
> . . . .
>
> . . . I'm deeply concerned that evidence keeps appearing during trial.  After . . . witnesses are cross-examined.  Okay?
>
> . . . .
>
> . . . I hate when stuff comes up during trial.  And that's the concern I have right now, is that stuff keeps appearing, during the course of the trial. . . .  I'm at a loss as to what else . . . I don't quite know what else can come out.  And what I don't wanta do is to get to the end, have the jury reach a verdict, and then have to come back and retry it because all of a sudden Cheneyville found the file.  Now, . . . the recorded statements, I, I'mma be honest with you, I've never understand [sic] why police recorded statements are used to impeach anybody, 'cause they're . . . a transcription of a recording that's not certified.  It's not like a court reporter's doing it?
>
> . . . .
>
> . . . But that's . . . just me.  Maybe I just get hung on detail[s] sometimes.  But pictures of the crime scene, that's kinda big.
>
> . . . [T]he problem I have is, if you're correct, it's been produced yesterday, and you guys have spent months getting ready for this thing.  And if now, one side is getting evidence that's gonna help their case, I certainly would like to have that evidence presented in enough time to where when we go through the cross-examinations and all the other examinations, and present the evidence, it's all done cleanly.  So, what I'm looking at now, . . . if I allow the trial to go

forward, do we have to go back and go through everything again, 'cause now we've got new evidence?

. . . .

. . . I'm deeply concerned that these pictures . . . and I, what I'm gonna do, is I'm gonna submit these into the record for purposes of identification. . . .

. . . .

. . . My point is, you guys are not getting complete information. . . .

. . . .

. . . from the witnesses in this case, and that's your job to elicit that information on direct and cross. But, to the extent that there are, there's evidence available, like crime scene photos, that is supposed to be produced, and I know it's the, it's with the open file discovery, it's a tradition of the DA's Office, . . . .

. . . .

. . . and I have no doubt that had you had the information, it would have been provided, Mr. Metoyer.

. . . .

. . . [W]e've beat this horse to death. I just need to decide if I'm gonna allow the trial to go forward. . . . [T]hat's what I need to decide. . . .

. . . .

. . . I have looked at the issue of the crime scene . . . photographs, and I, I don't have before me a motion for mistrial by either party.

. . . .

. . . Okay. I am . . . deeply troubled by the fact that the evidence, the way the evidence was handled in the investigation in this matter. But, ah, I'm not gonna declare a mistrial at this point. . . .

The next record location referenced by the defense occurred during Detective Keith Fennel's testimony. The parties participated in questioning Detective Fennel in the judge's chambers about the late addition photographs. The

13

discussion revealed that the original six photographs that were in the file were not actually in the officer's records while the photographs that were provided to the parties during trial were part of his records. Though his software should have shown whether the six original photographs had been deleted from his records, it gave no such indication. The defense pointed out that they had been showing the six pictures during trial, but they did not know who took them or their origin. The prosecution agreed to have the six original photographs removed from evidence, and the defense requested a limiting instruction. The court then ruled that the six unverified photographs would not be allowed into evidence.

After the court's ruling, defense counsel moved for a mistrial on the basis of the unverified photographs and that the late addition of the twenty-two verified photographs clarified the crime scene. The new photographs showed where the victim fell, where Defendant was standing, and where the shell casing landed.

The State replied that it had already admitted photographs into evidence that had been taken by the District Attorney's Office; those photographs showed more detail than the original six unverified images and provided a clear image of the crime scene, and the prosecution's pictures had been provided to the defense. Moreover, the State only had access to the same information it provided to the defense.

The trial court acknowledged that neither party had access to the twenty-two verified photographs before trial. Then, the district court noted the defense was arguing that it had based its case on the six unverified photographs, which were no longer going to be admitted into evidence and that it did not have time to adequately analyze the information provided by the new group of photographs. The trial court pointed out that they now had much better pictures of the crime scene.

Defense counsel agreed that, prior to the newly discovered photographs, it had nothing to rebut the District Attorney's scene reconstruction images. Prior to the new photographs, neither party had been able to determine where the blood pool or the shell casing was located. The only discernible information from the original six unverified photographs was the relative location of the cars, the location of a pink comforter, and location of the gun and pack of bullets in the trunk of one of the vehicles. Defendant urged that, though one could see a black spot, it was questionable as to whether or not it was blood, and the new photographs show the black spot may not have been blood.

Ultimately, after considering the arguments presented by both parties, the district court denied Defendant's motion:

> I disagree that it looks very different. I've thought about this, and I've been thinking about [it] since this morning when I considered just going ahead and granting a mistrial on my own motion, without anybody's request, and now that I'm faced with a motion for mistrial from the Defense, I'm gonna deny the motion. I, I don't think you can prejudice with the fact that you now have the better crime scene pictures. While I am disturbed by the fact that, ah, those pictures were not produced, because they weren't provided to the District Attorney's Office until yesterday, . . . you still have the opportunity to, to cross-examine all the witnesses, and there's really only . . . been testimony, as I recall, from one witness concerning locations of individuals. Ah, we have some pictures that were entered . . . into [evidence] by the District Attorney's Office with some "X's" and stuff. I, I don't know how helpful those are, but certainly we've got, as I appreciate it, we have the Defendant, . . . Jessica[,] [a]nd the Defendant's wife, who are the only three direct witnesses. Two of those people have not testified, and I don't know [whether] or not your guy's gonna testify, and that'll be your decision[.]
>
>      . . . .
>
>      . . . [Y]ou have the ability to cross, to recall Jessica and go over those pictures with her in your case-in-chief. So, I'm gonna deny the Motion for Mistrial at this time. . . .

Defendant's brief to this court next references a segment of the victim's testimony where the defense used the transcript to impeach his statements. The

victim, Mr. Malone, had just finished stating that, when his sister, Defendant's wife, pulled a knife on him that morning prior to the shooting, he grabbed both her and the knife, but he did not take the knife from her. Defense counsel asked the victim if he recalled telling officers, "And she ran at me with the knife, and I grabbed the knife from her, and she left out the house and went to the police station." Mr. Malone denied making the statement, "In a statement that I did on recordin' that was rewritten by Lord knows who. And I did not say that." When questioned about a second statement, which also seemed to contradict Mr. Malone's claim that he had not removed the knife from his sister's grasp, Mr. Malone said that she kept the knife and that she still had the knife when she left the house.

Defendant again references the defense's cross-examination of the victim. During this segment of the transcript, the defense asked Mr. Malone whether he had made the statements on which the defense had previously cross-examined Ms. Stelly, who had denied that the transcribed statements were verbatim. Mr. Malone denied saying the quoted language and asserted they did not sound like something his sister would say.

Finally, Defendant references the State's closing argument in support of his assertion that the State mishandled, misplaced, and lost evidence and that there were severe deficiencies in the investigation of the crime as well as in the collection and safeguarding of the evidence:

> The State put on, at first, the members of the Cheneyville Police Department. And ladies and gentlemen of the jury, I don't need to tell you that this case was handled horribly by them. The shooting occurred on May 5th of 2008; the report is not completed, and substantially not investigated, until some time in 2009. And the reason for that is that the police department thought of the victim as a bad person, because he had been convicted of a crime before. They didn't take the time to think about the fact that the [prior] crime was done in defense of another person, as the testimony showed at trial.

16

They didn't think about the fact that this person was a victim of a crime, he's now paralyzed. They simply got the report in, made an arrest, let the Defendant bail out of jail, and then sat on the report. Did nothing. Well, that's terrible enough in the very beginning.

Louisiana Code of Criminal Procedure Article 775 requires the trial court to order a mistrial if prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to obtain a fair trial:

> A mistrial may be ordered, and in a jury case the jury dismissed, when:
>
> (1) The defendant consents thereto;
>
> (2) The jury is unable to agree upon a verdict;
>
> (3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
>
> (4) The court finds that the defendant does not have the mental capacity to proceed;
>
> (5) It is physically impossible to proceed with the trial in conformity with law; or
>
> (6) False statements of a juror on voir dire prevent a fair trial.
>
> Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
>
> A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.

"[M]istrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial." *State v. Weary*, 03-3067, p. 36 (La. 4/24/06), 931 So.2d 297, 321, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006). "The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge; this decision will not be overturned on appeal absent an abuse of that discretion." *Id.*

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed. 2d 215 (1963). Favorable evidence includes both exculpatory evidence and evidence impeaching the testimony of a witness when the reliability or credibility of that witness may be determinative of defendant's guilt or innocence or when it may have a direct bearing on the sentencing determination of the jury. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 Le.Ed.2d 481(1985). Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely that not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*State v. Verret*, 06-1337, pp. 21-22 (La.App. 1 Cir. 3/23/07), 960 So.2d 208, 222, *writ denied*, 07-830 (La. 11/16/07), 967 So.2d 520 (citations omitted). "An appellant is not deprived of his due process rights based on the state's failure to preserve potentially exculpatory evidentiary material unless bad faith is demonstrated." *State v. Harris*, 01-2730, p. 20 (La. 1/19/05), 892 So.2d 1238, 1253, *cert. denied*, 546 U.S. 848, 126 S.Ct. 102 (2005) (citing *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337).

In *Verret*, the State received some information from a Sheriff's officer regarding the victim in the case during the presentation of the defendant's case. *Verret*, 960 So.2d 223. The prosecution advised that it did not have the information until after the testimony of one of the defense's witnesses. *Id.* The State promptly provided the information to the defense. *Id.* The information contained the victim's statement to the police, and the victim's statement contradicted her testimony trial. *Id.* at 223-24. The defense moved for a mistrial

18

based upon a *Brady* violation; however, the trial court denied the motion. *Id*. at 224. The first circuit found no abuse of discretion because the defendant "did not suffer such substantial prejudice that he was deprived of any reasonable probability of a fair trial." *Id*. at 225.

In the instant case, both the State and the defense were simultaneously provided with the pictures. A comparison of the six unverified photographs to the twenty-two actually admitted into evidence does not show any clear prejudice to the defense. The original six photographs show two overviews of the crime scene as viewed from two different angles outside the crime scene tape, the blood pool, the empty shell casing lying on the ground, the rifle recovered from the scene, and a loaded clip of ammunition plus a loose bullet lying on a blanket atop a tire. The images substituted for the original images show similar and additional views of the crime scene both inside and outside the tape, near and distance shots of the bullet casing lying on the ground, near and distance images of the blood pool, and what appears to be a cluttered trunk space containing a toy horse, a pen, a loose bullet, an empty package of bullets, and a coin. Thus, there were additional images of the same information contained in the verified photographs. Also, Defendant benefited from the substitution as the verified photographs did not include any images of either the weapon used in the offense or the loaded clip of bullets. Therefore, Defendant was not clearly prejudiced by substitution of the photographs discovered during trial for the original six unverified images. Moreover, the officer who provided the verified photographs was recalled, and both parties were allowed the opportunity to question him about the images.

Furthermore, review of the record shows that Defendant was not deprived of his right to cross-examine the witnesses. The defense successfully used the

transcriptions of the witnesses' police statements to point out inconsistencies between their trial testimony and their prior statements.

Insofar as Defendant references the officer's testimony that Defendant's statement to police was lost, it appears that the loss of the statements could only have benefited Defendant because, as Defendant testified at trial and maintained his self-defense theory, his prior claim of self-defense was allowed into evidence, but there was no recorded statement available to impeach his credibility on the details of the matter.

Accordingly, the trial court did not abuse its discretion in both declining to and refusing to order a mistrial in the instant case.

### ASSIGNMENT OF ERROR NO. 2

In this assignment of error, Defendant argues that his sentence of five years at hard labor with credit for time served is excessive:

> The Trial court erred by imposing an excessive, maximum sentence of five (5) years imprisonment at hard labor for Second Degree Battery against a first-time felony offender who acted in self defense. The trial court gave insufficient consideration to the personal history of the alleged victim, including his own use of a firearm in an aggressive manner. Nor did the trial court consider that the evidence tended to support a conclusion that the victim had facilitated or contributed to the harm in this case, a mitigating factor under the sentencing guidelines article.

The defense asserts that, despite finding that every mitigating factor set forth in La.Code Crim.P. art. 894 applied in the instant case, the trial court imposed the maximum possible penalty because "a lesser sentence would deprecate the seriousness of the offense." Defendant contends this constitutes an abuse of discretion as maximum sentences are reserved for the worst offenders. The defense posits that Defendant is not the worst type of offender and that he does not pose a risk to public safety.

20

In imposing the penalty on Defendant, the sentencing court stated the reasons for its decision:

> I have reviewed the matter, sat through the trial, considered all the post trial motions. I know that Mr. Jacobs has no criminal record, hard working, supports his family. Ah, I do think he regrets what happened. Under, ah, 894.1: "A court should order a sentence of imprisonment if any of the following occurs: There's an undo risk that he will commit another crime", I don't really feel like that's present. "The defendant is in need of correctional treatment in a custodial, . . . in a . . . custodial environment". And I don't feel like that's present. However, "a lesser sentence will depreciate the seriousness of the crime", that's certainly present. Ah, Mr. Jacobs left work, knowing there was a problem; put himself in a position for the incident to happen; had a loaded gun, fired by his own testimony, without looking in the direction of the . . . victim - - there were several people in the area. When you go through the factors, ah, he did knowingly create a risk of death or great bodily harm to more than one person. He did use actual violence in the commission of the offense. Certainly there is no doubt that the offense caused a significant personal injury and significant economic loss to the victim. He did use a dangerous weapon. Ah, if he had just stayed at work nothing would have happened. He's continued to argue that he acted under strong provocation. I have considered that fact; I did sit through the trial. He did, ah, through counsel, have continued to argue there are substantial grounds tending to excuse or justify his conduct, though failing to establish a defense. He did argue that the victim's, ah, conduct facilitated or induced its commission, even though the jury rejected that argument. He has no history of prior delinquency or criminal activity, and has apparently led a law-abiding life. Can't say that his criminal conduct was a result of circumstances that, ah, would occur again. And I, I do note that imprisonment would entail, ah a hardship on his dependents. However, he put himself in that situation with a gun. I think a lesser sentence would depreciate the seriousness of the crime, so, Mr. Jacobs, I'm gonna sentence you to five years at hard labor. You're to receive credit for time served.

Following sentencing, Defendant filed a "Motion to Reconsider Sentence" with the trial court. In his motion, Defendant asserted that his sentence was excessive because he did not have a prior criminal record, because of the unexplained loss or destruction of numerous pieces of evidence that possibly could have benefited Defendant at trial, because the victim had a substantial record of dangerous aggression and violence, and because one of the officers believed both

21

that the victim was also armed with a gun, which they were unable to locate during the investigation, and that Defendant was acting in self-defense.

The sentencing court denied Defendant's motion and issued written reasons for its judgment:

> On 2 May 2008, Mr. Jacobs fired a gun at Marcus Malone. The bullet struck Mr. Malone causing him to be a quadriplegic. There is no dispute that Mr. Jacobs fired the gun and that the bullet struck Mr. Malone causing him to be a quadriplegic. At the trial of this matter in June, 2010, Mr. Malone was in very poor health, and his health has only become worse since. This Court sentenced Mr. Jacobs to five years in prison at hard labor. Mr. Jacobs has asked the Court to reconsider sentence.
>
> This case started as a dispute between a brother and sister that occurred on the morning of 2 May 2008 and ended with Mr. Malone shot and bleeding on the ground. Mr. Jacobs left home that morning to go to work. While he was gone, his wife, Kristy Jacobs, got into a confrontation with her brother, Mr. Malone. After the dispute, Mrs. Jacobs left the residence. Shortly, after learning of the confrontation, Mr. Jacobs decided to leave work and go to residence and get their belongings so they could move. On the way to the residence, Mr. Jacobs asked a police officer about the requirements for self-defense. When he arrived at the residence, Mr. Malone was present pacing in the yard. Mr. Jacobs went inside and began to gather his family's belongings to put in the trunk of a car. In the trunk of the car was a .22 rifle. He made several trips inside the residence to retrieve his family's belongings while Mr. Malone paced about the yard. Mr. Jacobs was not afraid at that time. At some point, while he was loading his family's belongings into the car, Mr. Jacobs contended that Mr. Malone had a gun and was approaching him, so he pulled the .22 rifle from the trunk of the car and fired it at Mr. Malone. The jury did not accept that version of the facts. No other gun was found. The jury returned a verdict of guilty to Second Degree Battery.
>
> Mr. Jacobs was tried on the charge of Aggravated Battery, Second Degree and convicted of Second Degree Battery. Second Degree Battery carries a fine of not more than $2,000 and/or imprisonment, with or without hard labor, for up to five years. Under Louisiana Code of Criminal Procedures art[.] 894.1, a court should impose a sentence of imprisonment if any of the following occurs:
>
> 1.   There is an undue risk that the defendant will commit another crime;
>
> 2.   Defendant is in need of correctional treatment or a custodial environment;

> 3. A lesser sentence will depreciate the seriousness of the defendant's crime.

This Court has no evidence that there is an undue risk that Mr. Jacobs will commit another crime. He did not have a criminal record before this incident and has not been in trouble since this incident. Concerning the second factor, this Court does not find that Mr. Jacobs is in need of correctional treatment or custodial environment. However, this Court does believe that a lesser sentence would depreciate the seriousness of defendant's crime. At the sentencing, this Court went through the factors set forth in the Code of Criminal Procedures art. 894.1 finding that a lesser sentence will depreciate the seriousness of the crime, that Mr. Jacobs knowingly created a risk of death or great bodily harm to more than one person (by his own testimony, he fired the gun without looking and there was [sic] other people around), and that he used actual violence in the commission of the offense. In addition, the offense caused significant permanent injury and significant economic loss to Mr. Malone and his family. There is no dispute that the injuries Mr. Malone suffered were permanent, life changing and economically devastating. In addition, Mr. Malone's victim impact video was an important consideration. Although, Mr. Malone was present and did testify live at trial, his health would not permit him to attend the sentencing in person.

This Court has struggled with this sentencing, but [cannot] escape the conclusion that a lesser sentence would depreciate the seriousness of the defendant's crime. Had Mr. Jacobs simply waited and not gone to the residence, he could have avoided this whole situation, would not be facing a criminal conviction and a brother-in-law who is now quadriplegic. This Court imposed the current sentence after a careful consideration of all of the sentencing factors, the tone and demeanor of witnesses at trial and during the sentencing hearing, and a careful consideration of the law governing this case. For these reasons, the Motion to Reconsider Sentence is denied.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

23

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted).

Under La.R.S. 14:34.1, the possible penalties for a second degree battery conviction include a fine up to $2,000.00 and/or imprisonment for up to five years, either with or without hard labor. Therefore, Defendant is correct in stating that the sentencing court imposed the maximum possible term of imprisonment allowable under the applicable law.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

"[M]aximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender." *State v. Quebedeaux*, 424 So.2d 1009, 1014 (La.1982). Though Defendant maintains that he is not the worst type of offender, he does not argue that the facts of the instant

24

case do not constitute the most serious type of second degree battery violation. This court has held that the maximum sentence can be imposed in cases involving either the worst type of offender or the most serious violations of the offense. *State v. Hopkins*, 96-1063, p. 7 (La.App. 3 Cir. 3/5/97), 692 So.2d 538, 541. The record shows that Defendant endangered multiple people by firing a gun in the direction where other people were located. Defendant's bullet actually struck its intended target, who was unarmed. The resulting injury caused the victim to become permanently paralyzed from the neck down.

In *State v. Faulkner*, 570 So.2d 516, 518 (La.App. 5 Cir. 1990), the fifth circuit affirmed a five-year hard labor sentence for a first-time offender when the injuries to the victim included "a broken nose, several fractured ribs and a punctured lung requiring four days of hospitalization and three months of convalescence." The facts of the instant case show that, although Defendant was a first-time offender, the injuries received by the victim in the current case were much more severe than those received by the victim in *Faulkner*. Moreover, Defendant actually received a less onerous penalty that the defendant in *Faulkner* because he was not also required to pay $2,000.00 in restitution. *Id*. at 517.

Accordingly, we find Defendant's sentence of five years at hard labor does not constitute an abuse of the district court's sentencing discretion.

### DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed, with instructions.

**AFFIRMED, WITH INSTRUCTIONS.**

25

STATE OF LOUISIANA

VERSUS

ROBERT JAMES JACOBS

PETERS, J., dissenting.

I respectfully disagree with the majority's affirmation of the defendant's conviction. Specifically, I believe the trial court erred in not granting a mistrial when the state was unable to produce the audio tapes upon which the various transcribed statements were based. Both the majority and the trial court concluded that the defendant was not deprived of his right to cross-examine the state's witnesses because he had access to the transcribed statements. However, despite ultimately reaching this conclusion, the trial court recognized the major flaw in this approach when it noted that each transcript was nothing more than "a transcription of a recording that's not certified. It's not like a court reporter's[sic] doing it."

When questioned concerning the content of the various transcripts, the witnesses denied the accuracy of the prior statements. Thus, the defendant was left with nothing more than prior statements transcribed by law enforcement personnel whom the trial court had described as "incompetent." In fact, the state argued in closing that the entire investigation had been "handled horribly" by the Cheneyville Police Department. Without the audio tapes, the defendant could only hope the jury concluded that the law enforcement personnel were competent in transcribing the audio tapes while at the same time concluding that they were incompetent in most other respects. In my opinion, the defendant was denied a viable cross-examination and I would find merit in his first assignment of error.